In the Matter of BRUNO EISENSTEIN et al., Copartners Doing Business as SUNSHINE DAIRY FARMS Co., Petitioners, against C. CHESTER DU MOND, as Commissioner of Agriculture and Markets of the State of New York, Respondent.

Third Department, November 15, 1944.

*Chernin & Gold,* attorneys (*Bernard H. Chernin* and *James B. Gitlitz* of counsel), for petitioners.

*Donald L. Brush* (*Robert G. Blabey* of counsel), for respondent.

HILL, P. J. Petitioners seek to have reviewed, under article 78 of the Civil Practice Act, a determination made by the Commissioner of the Department of Agriculture and Markets, which denied their petition to purchase milk at their plant in the Town of Conklin, Broome County, for distribution outside the State.

The basis for the denial was stated to be section 258-c of the Agriculture and Markets Law, that milk producers in the locality in which petitioners were to operate have a market for their milk at plants already operating there. The Commissioner's findings contain the following as a conclusion. "If milk now being delivered to existing plants were to be diverted to the plants of the applicants, the cost per unit of operating the presently existing plants would be increased, and in the long run this would mean lower prices to producers supplying milk to these plants, or higher prices to consumers, or both." In the next paragraph the Commissioner in construing the statute determined that such a condition came within its purview, and that the issuance of the license would "tend to a destructive competition in a market already adequately served", and there being an inhibition in the statute against the issuance of the license under such conditions, it was denied.

In February, 1943, petitioners' plant was destroyed by fire. For some years before, they had maintained a dairy in excess of 150 cows, and had purchased milk from other producers. This had been distributed in Broome County in the vicinity of Binghamton, a portion at retail, some at wholesale. Because of the loss of the buildings and a portion of the dairy, they sold their distributing business and for some time the new owners purchased their milk. Many thousands of dollars have since been expended by petitioners on the dairy, plant, barns and creameries, and arrangements have been made to purchase

milk from other producers, which, with their own, was to be sold to distributors at Perth Amboy, N. J. Other dealers who were purchasing milk to ship to New York and to New Jersey opposed the application for the license.

Under article 21 of the Agriculture and Markets Law, one may not engage in this State in the business of a milk dealer without a license. It has been determined that the business is subject to such reasonable regulation as will promote the public welfare, but the prohibition of the right to engage in this lawful business may not be arbitrary, and conditions imposed must be reasonable. (*Matter of Elite Dairy Products* v. *Ten Eyck,* 271 N. Y. 488.) No question is raised that these petitioners are not qualified by character, experience, financial responsibility and equipment properly to conduct business as milk dealers. (Agriculture and Markets Law, § 258-c.) The grounds for denial were the other portion of the same section, that the issuance of the license would tend to " a destructive competition " in a market already adequately served. The statute in question was adopted by the Legislature following investigations in 1932 and 1933. A joint legislative committee was appointed " to investigate the causes of the decline of the price of milk to producers and the resultant effect of the low prices upon the dairy industry and the future supply of milk to the cities of the State ". The committee found in substance that the financial situation of dairy farmers in the State was desperate and was growing increasingly critical because of the decline in the general level of prices; the increase in the number of cows and amount of milk produced; the prevalence of unfair destructive trade practices in the distribution of milk and from other lesser contributing factors. The Commissioner in this case has arrived at the conclusion that in the area involved there are a sufficient number of milk dealers to buy milk from the producers and that should this license be granted " the cost per unit of operating the presently existing plants would be increased, and in the long run this would mean lower prices to producers * * * or higher prices to consumers, or both ", which he says would " tend to a destructive competition ".

Competition is the opposite of monopoly. It has been said that it is difficult of a definition which is inclusive as well as exclusive, but in general terms that it involves the idea of a struggle between rivals endeavoring to obtain the same end. Here it is a conflict between purchasers of milk which they hope to sell at a profit. (*People ex rel. Pratt* v. *Goldfogle,* 242

N. Y. 277; *Wrisley Co.* v. *Federal Trade Commission,* 113 F. 2d 437; 15 C. J. S., Competition, p. 661; Webster's Dictionary.) The first of the two principal words in the phrase in question, " destructive " has considerable strength. " Causing destruction; tending to bring about ruin, death or devastation; ruinous; fatal; productive of serious evil." Among other synonyms given by Webster are " mortal, deadly, malignant and baleful ". " Ruined " is a weaker word than " destroyed " and may be synonymous with dilapidation or impairment of effectiveness. (*Stevens* v. *Moore,* 24 Tenn. App. 61.) " Damage " is distinguished from " destroy ". (*Holderbaum* v. *Hidalgo County Water Imp. Dist. No. 2,* 297 S. W. [Texas] 865; 25 C. J. S., Damage, p. 445.)

The Legislature did not authorize the Commissioner to deny a license for a light and trivial reason, but only in the event, so far as this case is concerned, that the granting would tend not only to damage but to destroy competition. The finding that " in the long run " the unit cost (a can or a quart) would be increased with a resultant change in the price paid the producers is most remote, and not sustained by the proof. Respondent has no concern with the ultimate purchaser in New Jersey.

The logic by which the Commissioner seeks to sustain the " destructive competition " theory is speculative and tenuous. The proposed purchase by petitioners will broaden and improve the milk market for the farmer-producers, and they were the class for whose benefit the legislation was enacted. Petitioners intend to buy the greater part of their milk in Pennsylvania, which does not concern respondent. The comparatively small amount of New York produced milk to be purchased (two or three hundred cans a day) probably will have no effect on the local market, but such as it does have will benefit all parties, including the objectors, for with the almost unlimited opportunity to expand in the dairy business which exists through this area, a broader and a better market will encourage expansion.

There is no evidence to sustain the finding that the granting of the license would " tend to a destructive competition." The determination should be annulled and the matter remitted to the Commissioner.

All concur.

Determination annulled, with fifty dollars costs and disbursements, and matter remitted to the Commissioner.